IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LANCE OLIVER SCOTT, G36437, | ) | No. C 12-0717 CRB (PR) |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER DENYING PETITION** |
| | ) | **FOR A WRIT OF HABEAS** |
| MATTHEW MARTEL, Warden, | ) | **CORPUS** |
| Respondent. | ) | |
| ——————————————————— | ) | |

## I.    INTRODUCTION

Lance Oliver Scott (hereinafter "Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction on five arson and three drug-related counts.  This Court dismissed Petitioner's Fourth Amendment claim and issued an order to show cause on the two remaining claims for violation of <u>Miranda</u> and improper exclusion of evidence, finding them cognizable under § 2254.  Warden Matthew Martel (hereinafter "Respondent") filed an answer addressing the merits of the petition, but Petitioner did not file a traverse. For the reasons discussed below, the petition is DENIED.

## II.   BACKGROUND

### A.    Procedural History

On November 16, 2007, the Monterey County District Attorney's Office filed an information charging petitioner with 11 counts of arson of a structure or a forest (Cal. Pen. Code § 451(c)), with an aggravating factor as to count 10 for alleged use of an accelerant

United States District Court
For the Northern District of California

(§ 451.1(a)(5)); cultivation of marijuana (Cal. Health & Safety Code § 11358); possession of marijuana for sale (Cal. Health & Safety Code § 11359); and manufacturing a controlled substance by chemical extraction (Cal. Health & Safety Code § 11379.6). On August 29, 2008, a jury found Petitioner guilty of arson on counts 2, 3, 4, 6, and 11. The jury found Petitioner not guilty of the other arson counts, including the allegation for use of an accelerant. The jury found Petitioner guilty of the three drug-related counts. On September 26, 2008, the Monterey Superior Court (hereinafter "trial court") sentenced petitioner to a prison term of 10 years and 8 months. On March 4, 2011, the California Court of Appeal affirmed the judgment of conviction and, on June 15, 2011, the Supreme Court of California denied review. The instant federal petition followed.

**B.     Facts**

The California Court of Appeal summarized the evidence introduced at trial as follows.

**Prosecution Case**

Between June 2006 and August 2007, a series of fires occurred in the Jacks Peak area of Carmel. Jacks Peak is a heavily wooded, residential area with large homes on large lots. Access to the area is via a series of narrow roads. The terrain varies, but generally consists of grasslands and oak and pine woodlands.

The prosecution presented much of its case through the testimony of Cal Fire investigators Cliff Williams and Mark Kendall, who were the lead investigators on the case. At the time of trial, Williams had been with Cal Fire for 36 years and had 22 years experience as a fire investigator; Kendall had been with Cal Fire for 16 years and had been a full-time fire investigator for seven years. Other prosecution witnesses included: residents of Jacks Peak and other persons who discovered the fires, fire personnel who were involved in fire suppression, other fire investigators and law enforcement officers involved in the investigation, an expert in GPS tracking, and a jail informant.

Between 2002 and 2006, there were one or two accidental fires per year on Jacks Peak and no arson fires. Between June 2006 and August 2007 there were 13 arson fires on Jacks Peak. The parties presented evidence regarding the 11 charged fires, plus three uncharged arson fires. All 11 charged fires occurred near roads; most of the fires were on the uphill side of the road on a "cut bank." ("When a road is cut into a hillside with a piece of machinery, the uphill side where the blade cuts in is referred to [as] a cut bank.") Williams explained that if you want a fire to spread, you light it on the uphill side of the road, since fire naturally spreads uphill.

United States District Court
For the Northern District of California

**Count 1 - July 3, 2006 on Valenzuela Road (Not Guilty)**

On July 3, 2006, there was a grass fire on Valenzuela Road, which burned an area 20 by 40 feet in size. The fire was caused by a TNT brand, ground bloom-type firework. Ground bloom fireworks are well-known for starting fires because they burn very hot; the flame resembles a flower and the firework spins around at a high rate of speed. Firefighters estimated the time of ignition as 11:00 p.m., eliminated other causes, and determined that this fire was due to arson.

In Monterey County, safe and sane fireworks are sold only in the cities of Marina and Seaside and only from June 28 until July 6 each year. They can be set off legally within the city limits of Seaside and Marina; however, it is common for people to buy them in those cities and take them to other parts of the county.

**Uncharged Fire No. 1 - July 3, 2006 in Pebble Beach**

The same day as the fire in count 1, there was an arson fire on Viscaino Road in Pebble Beach, caused by a ground bloom-type TNT firework. The estimated time of ignition was 10:49 p.m., 11 minutes before the fire on Valenzuela Road. Fire investigators testified that it was possible to get from one location to the other by car during that time. However, they were not sure whether the Pebble Beach fire was part of the series of fires, since it did not occur on Jacks Peak. Williams testified that it would be harder for an arsonist to operate in Pebble Beach than Jacks Peak because Pebble Beach is a gated community.

**Count 2 - September 26, 2006 on Viejo Road (Guilty)**

On Tuesday, September 26, 2006, there was a small vegetation fire on the uphill side of Viejo Road, eight to 10 feet above the roadway. The source of the fire was a sparkler. The sparkler was not consumed by the fire because it threw sparks upward and the fire burned away from the sparkler. The fire was reported at 10:11 a.m.; Kendall estimated that it started at 10:05 a.m. Kendall opined that someone threw the sparkler out of a moving car window and that it landed on pine needles and grass that readily ignited.

**Uncharged Fire No. 2 - June 29, 2006**

On cross-examination, defense counsel elicited evidence that there was a fire that was similar to the fire in count 2 on June 29, 2006, on Aguajito Road. A resident reported seeing a "young man," a blonde "adolescent" shooting fireworks into the brush on the side of the road. The adolescent was "standing next to a red, late-model American car." Defendant's three vehicles included an old (1994) red Oldsmobile. Kendall assumed the prosecution did not charge this fire because by the time defendant was arrested, the reporting party and the fire captain that responded to the fire had passed away.

**Count 3 - October 3, 2006 on Viejo Road (Guilty)**

On Tuesday, October 3, 2006, there was a small fire on a cut bank adjacent to Viejo Road. The source of ignition was a matchbook. The cover of the matchbook had been torn off and the matches had been separated and spread apart into two rows. When investigators searched defendant's home, they found matches that had been prepared in the same way in his master bathroom.

The fire was reported at 10:02 a.m. By the time firefighters arrived, the fire had burnt out due to moist weather. This fire was 100 yards from the fire in count 2.

**Installation of Surveillance Cameras**

Since there had been a number of fires on Jacks Peak, Cal Fire provided Kendall with surveillance cameras, which were placed at three locations: (1) at the intersection of Monhollan and Aguajito Roads near the eastern entrance into the area; (2) on Viejo Road, toward the middle of Jacks Peak, and (3) at the western entrance to the area at Aguajito Road and Highway 1. The cameras were in place by October 24, 2006.

**Count 4 - October 24, 2006 on Viejo Road (Guilty)**

On Tuesday, October 24, 2006, at about 10:00 a.m., area resident Robin Selvig spotted a fire across the street from her home on Viejo Road and called 911. She and her husband cleared the ground around the fire with a shovel until firefighters arrived. The fire was on a cut bank adjacent to the road, six to eight feet from the fire in count 3. The fire was bigger than previous fires, but burned less than a quarter of an acre. The fire was caused by crumpled up pieces of paper that had been ignited. The wad of paper was big enough to have been thrown, while lit, from a passing car. The paper landed in dry grass on the side of the road and the fire traveled up the cut bank.

Kendall reviewed the surveillance tapes after this fire. The image of a 1994 beige Mercury Sable (identified by its license plate number) also owned by defendant was captured on the camera at Viejo Road at 9:54 a.m. Thus, eight minutes before the 911 call, defendant's car was less than 1 mile from the fire in count 4. Defendant's car was the last vehicle to come through the area before the fire was reported, so his car became a "vehicle of interest." The fires in counts 2, 3, and 4 occurred on Tuesdays, around 10:00 a.m.

**Count 5 - March 3, 2007 on Valenzuela Road (Not Guilty)**

On March 3, 2007, at 2:35 p.m., a resident noticed smoke near 500 Valenzuela Road and called 911. This fire was 200 to 300 yards from the fire in count 1; it burned an area 20 to 40 feet in size on the uphill side of the road.

Unlike the other fires, the fire investigators could not find a recognizable device that started this fire. Williams ruled out other possible causes including power lines, vehicle exhaust, the Christmas lights on a nearby fence, burning cigarettes, lightning, campfires, debris burning, railroads, sparks from construction equipment, and persons playing with fire, and concluded that this was a purposefully lit fire of unknown origin. Williams uses this process of elimination and a checklist of possible causes each time he analyzes a fire. He explained that this may have been a "hot start," meaning that the perpetrator retained the device that was used to ignite the fire. The ignition device also could have burned up in the fire or been destroyed by fire suppression activities. Williams had no doubt this was an arson fire. He felt it was part of a pattern because of its proximity to the other fires.

**Count 6 - July 5, 2007 on Aguajito Road (Guilty)**

On July 5, 2007, at 2:41 p.m., resident Donelle Laughlin saw a small fire,

about two feet by two feet in size, next to the roadway on Aguajito Road and called 911. Williams estimated that the fire started at 2:35 p.m. and determined that it was caused by a matchbook. The matchbook was similar to that found in the fire in count 3. In forensic tests done in another case, Williams determined that a lit matchbook could "sail" 10 feet out of the window of a car moving at 20 miles per hour.

The surveillance cameras at Highway 1 revealed that defendant's car entered the area seven minutes before the fire started; Kendall testified that it was possible to drive from that spot to the location of the fire in seven minutes. The camera at Monhollan showed a car similar to defendant's leaving Jacks Peak two minutes after the fire started.

**Count 7 - July 12, 2007 on Valenzuela Road (Not Guilty)**

On July 12, 2007, a UPS driver observed a fire on an uphill bank adjacent to Valenzuela Road at 5:48 p.m. and called 911. The fire burned about a quarter of an acre. By process of elimination, fire investigators determined that this was an arson fire, but were unable to locate the device that caused this fire.

The surveillance cameras showed defendant's car entering Jacks Peak at 6:06 p.m. on July 12, 2007, with a child in his backseat. The camera on a resident's gate captured images of a red Oldsmobile much like defendant's car making a U-turn in a driveway near the fire 18 to 20 minutes after the fire was reported. Kendall testified that it was not uncommon for arsonists to return to fire scenes to see what they have created.

**Count 8 - July 17, 2007 on Viejo Road (Not Guilty)**

On July 17, 2007, a motorist saw a grass fire on Viejo Road at 9:34 p.m. and called 911. This fire burned an area 50 feet by 30 feet in size on a cut bank. Kendall estimated the time of ignition as 9:30 p.m. By process of elimination, he determined that this was an arson fire, but was unable to locate the device that caused this fire.

**Count 9 - July 21, 2007 on Barnet Segal Road (Not Guilty)**

On July 21, 2007, there was an arson fire on Barnet Segal Drive. The fire was reported at 3:33 p.m. and burned an area 100 feet by 50 feet in size on a cut bank adjacent to the road. Williams was unable to locate the device that caused this fire. But by process of elimination, he determined that it was an arson fire.

**Surveillance Team**

In July 2007, Cal Fire assigned 15 fire investigators to conduct surveillance on defendant. The surveillance teams started watching defendant on July 22, 2007; eight to 10 officers watched defendant at any given time. Several members of the surveillance team testified at trial.

The investigators had difficulty following defendant because he was very erratic in his driving. He drove recklessly at excessive speeds, he zigzagged in and out of traffic, and failed to stop at stop signs and traffic signals. Following defendant posed significant risks to the public and the officers. Even with seven or eight people following defendant, they lost him most of the time. Moreover, because of the mountainous roads on Jacks Peak, it was easy for

defendant to determine when he was being followed.

**Count 10 - July 25, 2007 on Aguajito Road (Not Guilty)**

Area resident Diane Carol saw five-foot flames on the side of Aguajito Road as she drove by at 10:22 p.m. on July 25, 2007. She stopped and called 911. She threw a towel and some water she had in her car on the fire and extinguished it. Under the towel, fire investigators found an incendiary device made out of six model rocket motors, two $CO_2$ cartridges, and a shop towel that had been soaked in a combustible liquid. Investigators determined that the incendiary device caused the fire.

Investigators observed defendant's Oldsmobile leave his house at a high rate of speed at 10:00 p.m. An investigator attempted to follow defendant, but lost track of him. By 10:35 p.m., defendant's car was parked back at this house. The search of defendant's home uncovered a model rocket kit without the motors and a $CO_2$ canister; however, those items were not of the same type used in the incendiary device.

**Installation of Nighttime Cameras and GPS Tracking Device; Drug Sale**

Since the fires had started to occur at night, the investigators installed infrared (nighttime) cameras at the entry points at Monhollan Road and at Highway 1 on August 3, 2007. Later, a third camera was installed on Viejo Road.

On August 3, 2007, Kendall installed a GPS tracking device under the rear bumper of defendant's Oldsmobile, which was the car that defendant drove most of the time. The surveillance team followed defendant and his wife to a restaurant in Seaside and installed the GPS device while they were having dinner. The GPS tracking device was equipped with a cell phone. Investigators can call the device and follow a suspect in "real time." They can also call the device and download data at a later time. Police investigator Mark Hatcher testified as an expert witness regarding the GPS tracking device and explained how it worked.

On August 8, 2007, officers observed defendant and his wife on Fisherman's Wharf, where defendant's wife made a hand-to-hand exchange with a male.

**Count 11 - August 4, 2007 on Barnet Segal Road (Guilty)**

On August 4, 2007, there was a fire on Barnet Segal Drive, which was reported at 8:49 p.m. The reporting party used a fire extinguisher and his feet to put the fire out. The fire department also responded. The fire burned an area five feet in diameter on a cut bank above the road surface. Williams eliminated other causes and determined that this was an arson fire. He did not find the device that caused the fire.

Investigator Winningham observed defendant's car, with defendant driving, exit the parking lot of the Del Monte Shopping Center (DMSC), which is on the opposite side of the highway from Jacks Peak and Barnet Segal Drive, at 8:41 p.m. Investigators Eldridge and Harp (in separate cars) followed defendant's car as it drove up Soledad Road and under the freeway. Both saw defendant's car turn left onto Barnet Segal Drive. Harp lost sight of the car after the left turn. Eldridge got onto the freeway, which parallels Barnet Segal, and continued to observe defendant's car until he lost sight of it near the area

where the fire occurred.

The GPS tracking data confirmed what the investigators saw: defendant left DMSC at 8:40:51 p.m., went down Soledad Road under the freeway and turned left onto Barnet Segal; it also confirmed that defendant was at the location of the fire at 8:42:50 p.m.

### Uncharged Fire No. 3 - August 11, 2007 on Loma Alta Road

On August 11, 2007, at 2:54 p.m. a customer at a retail store in Seaside spotted a fire at the top of Jacks Peak and called 911. The fire was on a cut bank on Loma Alta Road. The road dead ends near the top of Jacks Peak and is not well-traveled. Williams determined that this was another arson fire of unknown origin and opined that, given its location and the foggy weather conditions, it had smoldered for a long time before breaking into open flame. Video cameras revealed that a car defendant had rented entered Jacks Peak at 12:26 a.m. and exited at 1:01 a.m. on August 10, 2007. This was the last arson fire on Jacks Peak.

### Impact of Fires on Residents

Area residents testified about ways the fires affected their lives. The Mathesons altered their schedules and were hesitant to go on vacation because of the fires. Diane Carol was on guard, looking for the fire in count 2 under the front seat of "pretty scary." Every time Selvig went outside, she checked for the smell of smoke. She kept her photographs in her garage, ready to put them in her car and leave.

### Execution of Search Warrant for Defendant's Home and Cars

Fire investigators obtained a warrant and arrested defendant and searched defendant's home and vehicles on August 12, 2007. They found sparklers similar to those used to ignite the fire in count 2 under the front seat of defendant's Oldsmobile. The wooden stems on the sparklers were broken. Kendall opined that the stems were broken to make it easier to toss the sparklers. The investigators also found illegal fireworks in the car, but no ground bloom fireworks.

As the officers entered defendant's home, they smelled marijuana burning; smoke was coming from a bong that defendant's wife had been smoking when the officers knocked on the door. The officers found sparklers on the kitchen table and a burnt sparkler with a bent stem on the back deck. They found a Whistling Pete firework on the kitchen countertop. They found newspaper articles regarding a murder/arson in Prunedale and photographs of a controlled burn at Fort Ord. Williams told the jury that serial fire setters collect news articles and photographs of other fires.

The officers observed marijuana growing in pots on the back deck and in the ground 50 to 100 feet below the deck. They found a two-pound ball of marijuana in the freezer. They found 15 bags of marijuana seeds, bags of bud marijuana, seven baggies of marijuana that had been packaged for street sales, big bags of marijuana weighing about 5 pounds, photos of marijuana gardens, and magazines dedicated to cultivating marijuana. They found hashish, drug paraphernalia, scales, $2,000 in cash, motion sensors, and a night vision scope. They found a pipe that had been jammed full of marijuana and butane, which

were used to make an extract known as "honey oil," as well as some honey oil on a plate.

Deputy Sheriff Robert Gonzalez opined that the amount of marijuana in defendant's home was more than would be required for two persons' personal use and that defendant was growing marijuana for sale. A member of the surveillance team observed defendant meet with the same man at Carmel Beach every other day. He saw defendant and the man make two hand-to-hand exchanges.

Kendall tested five sparklers in vegetation similar to that on Jacks Peak. All five of them were totally consumed by the fires they started, leaving no evidence that they caused the blazes.

**Testimony of Jail Informant**

Michael Morris was in the same dorm as defendant at the county jail. Defendant told Morris that he was accused of the Jacks Peak fires and said he did not set the fires. But defendant said that it would be good for him if the fires continued while he was in jail and asked Morris if he knew anyone who would be interested in helping him by setting a fire on Jacks Peak. Morris thought there might be a "payday" in it for him and said he would think about it. Defendant asked him whether he had thought about it a couple of times.

On cross-examination, Morris admitted two prior felony convictions and that he regularly did dishonest things to support his drug habit. Morris said his probation officer threatened to violate his probation if he did not cooperate with the prosecutor.

**Defense Case**

Defendant presented the testimony of five character witnesses, who testified regarding defendant's love of the outdoors and interest in nature. Defendant is an avid fisherman, hunter, and camper; he is extremely knowledgeable about fishing, plants, animals, and rocks; he enjoys fossil hunting and looking for Native American artifacts. For two years, defendant did volunteer work for the Carmel River Steelhead Association, which is working to restore the steelhead trout population in the Carmel River. Witnesses were surprised to hear that defendant was charged with the Jacks Peak arsons, since defendant's attitude toward the land was to preserve it, not destroy it. The character witnesses described defendant's marijuana gardens on Jacks Peak and testified that defendant would haul water into the area to water his plants. Jacks Peak was a very profitable area for defendant and he knew the area well.

Defendant testified. He was 39 years old at the time of trial. He grew up in Carmel and Carmel Valley. He is married and has three children. He has been fishing since age 6 and started hunting at age 12. When he was young, his father had a horse on Jacks Peak. Growing up, defendant spent a lot of time hiking Jacks Peak; he has studied its flora and fauna and has grown marijuana there for years. Defendant testified about the animals, trees, bugs, plants, and mushrooms on Jacks Peak; he said there is only one person who knows more about the area than he does: a man who has worked at Jacks Peak Park for 20 years.

Defendant denied setting any of the fires on Jacks Peak. He respects the area

United States District Court
For the Northern District of California

and would never do anything to intentionally harm it. He often drives through Jacks Peak, rather than take the freeway, to get away in nature and because it is the "scenic route." He drove through Jacks Peak one to three times per week.

Defendant has grown marijuana every year since age 15 in several areas, including Jacks Peak. In 2006 and 2007, he started the plants on his back porch and transplanted them to Jacks Peak in June or July. He watered the plants by hauling water into Jacks Peak in a backpack.

Every Fourth of July, defendant buys fireworks from a legal stand in Seaside and sets them off on the blacktop at a Seaside school. Sometimes, he sets off illegal fireworks there. He bought sparklers because his kids liked them. The sparklers the officers found in his car were broken from being on the floorboard or just came broken. The sparklers were left over from the Fourth of July; defendant did not realize they were still in his car.

Defendant admitted selling marijuana and processing honey oil. He denied asking Morris to start a fire or find someone who would start fire.

Defendant drove his wife to work at a shoe store in Carmel. She started work at 9:30 a.m. He usually had his youngest child who was not yet in school with him. (Counts 2 through 4 (guilty) occurred on Tuesday mornings around 10:00 a.m.) Defendant's last full-time job was at the Monterey Abalone Company, five years before trial. He stopped working there because of an industrial injury (tennis elbow) that required surgery.

People v. Scott, No. H033759, 2011 WL 766946, at *1-8 (Cal. Ct. App. Mar. 4, 2011), review denied (Cal. June 15, 2011).

## III.   LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

9

1    materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).

2    "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

3    state court identifies the correct governing legal principle from [the] Court's decisions but

4    unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413.

5         "[A] federal habeas court may not issue the writ simply because the court concludes

6    in its independent judgment that the relevant state-court decision applied clearly established

7    federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

8    <u>Id.</u> at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

9    whether the state court's application of clearly established federal law was "objectively

10   unreasonable." <u>Id.</u> at 409.

11        The only definitive source of clearly established federal law under 28 U.S.C.

12   § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of

13   the state court decision.  <u>Id.</u> at 412; <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003).

14   While circuit law may be "persuasive authority " for purposes of determining whether a state

15   court decision is an unreasonable application of Supreme Court precedent, only the Supreme

16   Court 's holdings are binding on the state courts and only those holdings need be

17   "reasonably " applied.  <u>Id.</u>

18   **IV.    DISCUSSION**

19        **A.    Petitioner's First Claim: <u>Miranda</u> Violation**

20        Petitioner claims that the trial court erred when it denied his motion to exclude

21   statements he made during his interview with Kendal and Eldridge on August 12, 2007,

22   shortly after he was arrested.  Petitioner argues that his statements were inadmissible because

23   they were obtained in violation of <u>Miranda</u> after he invoked his right to counsel.  The claim

24   is without merit.

25        **1.    Background**

26        On August 12, 2007, Petitioner was arrested and taken into custody at the

27   Monterey City Police Department, where he was questioned by Kendall and Eldridge.  <u>Scott</u>,

28

**United States District Court**
For the Northern District of California

10

2011 WL 766946, at *19.  The interrogation was recorded on videotape and later transcribed.
Id. Neither were admitted into evidence, but Kendall testified about the statements Petitioner
made during the interview.  Id.  Petitioner's challenge is based on the following portion of
the interview, which was reproduced by the California Court of Appeal.  Id., at *20.
Immediately before the exchange, Kendall produced and partially completed a written
Miranda waiver form.  Id., at *19.

| | |
|---|---|
| **MK [Mark Kendall]:** | My partner's gonna read you your uh, your rights, okay? |
| **RE [Ron Eldridge]:** | Okay, before we ask you any questions, you must understand your rights.  You have the right to remain silent, anything you say may be used against you in court.  Do you understand? |
| **LS [Petitioner] :** | Yeah. |
| **RE:** | Um, with this, uh, right in mind are you willing to talk with us? |
| **LS:** | Um, I don't really know what this is about, yeah. |
| **RE:** | We'll get to that. . . . |
| **MK:** | Yeah |
| **RE:** | But I need you to answer the question. |
| **LS:** | Will I. . . . ? |
| **MK:** | Yeah. |
| **LS:** | . . . will I talk with you? Yeah, I'll talk with you. |
| **MK:** | Okay . . . |
| **RE:** | You have the right to an attorney before and during any questioning, if you cannot afford an attorney, one will be appointed, appointed for you before, uh, any questions. Um do you understand these rights? |
| **LS:** | Uh, yeah. |
| **RE:** | With these rights in mind, are you willing to talk with us? |
| **LS:** | Um, yeah, I wanna know what this is about. |
| **MK:** | Okay. [I need] you to sign right here that, saying that you've understood your rights, right there. [ (Kendall handed defendant the waiver form.) ] (Pause) [ (There were 28 seconds of silence while defendant read the |

11

1    waiver form. It appears he read the entire form.) ]

2    **LS:**   I didn't say I don't wanna lawyer right now.

3    **MK:**   Okay, then sign right there. [ (It appears Kendall either did not hear or
             did not understand what defendant just said.) ]
4

5    **LS:**   What?

6    **MK:**   What, say, I'm sorry. . . .

7    **LS:**   I didn't say I didn't wanna lawyer right now. I'm, I'm not gonna sign
             that says I don't....

8    **MK:**   Okay.

9    **LS:**   . . . wanna a lawyer. . . .

10   **MK:**   Okay.

11   **LS:**   I mean, I might, might wanna law-, lawyer so. . . .

12   **MK:**   (Inaudible)

13   **LS:**   I mean, I could, I could write that, uh, I understand that, you know, I
             might, you know, so. . . .
14

15   **MK:**   Okay[.] [ (Defendant handed the unsigned waiver form back to
             Kendall).] [S]o, uh, with these rights in mind, do you wanna to talk to us
16            now?

17   **LS:**   Sure.

18   Id., at *20.  At that point, Kendall began questioning Petitioner.  Id.  Petitioner admitted that

19   he drove to the scene of one of the Jacks Peak fires after the fact, that he saw a large fire in

20   Sonora the week before, that he saw the August 11, 2007 fire on Jacks Peak from his kayak

21   in the bay, that he drove to Jacks Peak the night before that fire to "smoke a bowl," and that

22   he was at DMSC on August 4, 2007, after he was confronted with the surveillance evidence.

23   Id., at *21.  Petitioner denied lighting any fires that day or at any other time.  Id.  After

24   approximately thirty minutes, Petitioner stated: "Yeah, actually I do want to talk to my

25   lawyer, I think."  Id., at *20.  Kendall responded: "Okay, not a problem" and "interview's

26   over."  Id.

27        At trial, Petitioner made a motion in limine to exclude statements made to law

28   enforcement during the August 12, 2007 interview, arguing that they were obtained in

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

violation of <u>Miranda</u>.  <u>Id.</u>  Specifically, Petitioner argued that his statements were not a clear

waiver of his right to counsel.  <u>Id.</u>  The trial court reviewed the transcript and viewed the first

five minutes of the videotape, concluding:

> Well, for the purposes of this interview, I agree with the District Attorney's
> position. The defendant states twice that he does want to talk to them. They do
> go through this thing about him signing a waiver. He says, 'I don't want to sign
> a waiver,' apparently under the impression that if he signs something he's
> giving up his right to have a lawyer, period. But-and then he said-again, asked
> if he wants to talk to them now, and he says sure. [¶] So that's not really
> indicating any hesitancy to go along with the conversation. He just indicates he
> doesn't want to sign away a right that he may want to exercise in the future
> and, in fact, he does exercise it about a half hour later. So the Court feels that
> this interview, at least, is admissible.

<u>Id.</u>, at *21.

On appeal, Petitioner contended that his repeated assertions that "[he] didn't say [he]

didn't wanna lawyer right now," coupled with his refusal to sign the waiver form amounted

to an unequivocal request for counsel.  <u>Id.</u>, at *22.  In the alternative, Petitioner argued that,

under <u>United States v. Rodriguez</u>, 518 F.3d 1072 (9th Cir. 2008),  if those assertions were

ambiguous, then the officers were limited to asking clarifying questions.  <u>Id.</u>

The California Court of Appeal concluded that "there was nothing inappropriate about

the manner in which the interview was conducted."  <u>Id.</u>  Citing both <u>Davis v. United States</u>,

512 U.S. 452 (1994), and <u>Burghuis v. Thompkins</u>, 130 S. Ct. 2250 (2010), the court of

appeal reiterated that "when invoking the <u>Miranda</u> right to counsel, 'a suspect must do so

unambiguously.'"  <u>Scott</u>, 2011 WL 766946, at *20 (quoting <u>Thompkins</u>, 130 S. Ct. at 2259-

60 (internal quotations omitted)).  Additionally, "'[i]f an accused makes a statement

concerning the right to counsel that is ambiguous or equivocal or makes no statement, the

police are not required to end the interrogation, or ask questions to clarify whether the

accused wants to invoke his or her Miranda rights.'"  <u>Id.</u> (quoting <u>Thompkins</u>, 130 S.Ct. at

2259-60 (internal quotations omitted)).  The court of appeal disagreed with Petitioner's

contention that his request for counsel was unequivocal.  <u>Id.</u>, at *24.  Rather, the court of

appeal agreed with the trial court that Petitioner's use of the word "might" and his suggestion

that the waiver form be altered to indicate that he might want a lawyer in the future did not

amount to an unequivocal request for counsel at that time.  Id.  The court of appeal found that "defendant's statements were, at most, an ambiguous or equivocal request for counsel and that, under Davis, the officers therefore were not required to end the interrogation or ask questions to clarify whether the defendant wanted to invoke his Miranda rights."  Id. Nevertheless, "after [Petitioner] refused to sign the waiver form and made these ambiguous statements, Kendall asked a clarifying question: '[S]o, uh, with these rights in mind, do you wanna to talk to us now?' and [Petitioner] said, 'Sure.'"  Id., at *25.

The court of appeal rejected Petitioner's reliance on Rodriguez, in which the Ninth Circuit held that "the clear statement rule of Davis applies only after the police have already obtained an unambiguous and unequivocal waiver of Miranda rights."  Id., at *23 (quoting Rodriquez, 518 F.3d at 1074).  The court of appeal found that the officers here, unlike the officers in Rodriquez, did obtain an unambiguous statement from Petitioner that he was willing to talk to them: "After Eldridge gave defendant the Miranda warnings, but before Kendall asked defendant to sign the written waiver form, Eldridge asked [Petitioner] 'With these rights in mind, are you willing to talk to us?' and [Petitioner] responded 'Um, yeah, I want to know what this is about.'"  Id., at *24.

## 2.     Clearly Established Federal Law

A suspect subject to custodial interrogation has a Fifth and Fourteenth Amendment right to consult with an attorney and to have an attorney present during questioning, and the police must explain this right to the suspect before questioning. Miranda v. Arizona, 384 U.S. 436, 469-73 (1966).  When an accused invokes his right to have counsel present during custodial interrogation, he may not be subjected to further questioning by the authorities until counsel has been made available or the suspect himself reinitiates conversation.  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).  This "prophylactic rule [is] designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights."  Michigan v. Harvey, 494 U.S. 344, 350 (1990). The applicability of the "'rigid' prophylactic rule" of Edwards requires a court to determine

whether the accused actually invoked his right to counsel.  <u>Smith v. Illinois</u>, 469 U.S. 91, 95 (1984) (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 719 (1979)).  Petitioner relies on one sentence in <u>Miranda</u>, in which the Supreme Court stated that if a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."  384 U.S. at 444-45.  Nevertheless, the Court agrees with Respondent that post-<u>Miranda</u> precedent is controlling in this case.

In <u>Davis</u>, the Supreme Court specifically declined to extend the <u>Edwards</u> prophylaxis to situations in which a suspect makes a vague or ambiguous reference to an attorney.  <u>See</u> 512 U.S. at 459 (finding that "[i]f the statement fails to meet the requisite level of clarity, <u>Edwards</u> does not require that the officers stop questioning the suspect").  The Supreme Court reasoned that if a questioning officer reasonably does not know whether or not the suspect wants counsel, requiring the cessation of questioning "would transform the <u>Miranda</u> safeguards into wholly irrational obstacles to legitimate police investigative activity." <u>Michigan v. Mosley</u>, 423 U.S. 96, 102 (1975).  The Supreme Court sought "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogation[s]," by making the determination of whether an accused actually invoked his right to counsel "an objective inquiry."  <u>Davis</u>, 512 U.S. at 458-59.  "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  <u>Id.</u>  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," questioning need not cease.  <u>Id.</u> at 459.

In <u>Thompkins</u>, the Supreme Court further explained that <u>Miranda</u> "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights."  130 S. Ct. at 2262.  But, the law presumes that an individual who fully understands his rights and acts in a manner inconsistent with them has made "a deliberate choice to relinquish the

protection those rights afford." <u>Id.</u> (internal citations omitted). "Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." <u>Id.</u> at 2261-62.

### 3.      Analysis

Here, the California Court of Appeal reasonably determined that, in the context of the entire exchange, Petitioner's two statements ("I didn't say I don't wanna lawyer right now" and "I didn't say I didn't wanna lawyer right now") and his refusal to sign the waiver form did not amount to an unequivocal request for counsel. The court of appeal referenced both the videotape and the written transcript in reasonably concluding that Petitioner "interpreted the written waiver form as a waiver of the right to ever request counsel, something he was not willing to do." <u>Scott</u>, 2011 WL 766946, at *24. This, along with Petitioner's use of the word "might" when considering the waiver form ("[T]hat says I don't . . . wanna lawyer . . . . I mean, I might, might wanna law-, lawyer . . . . I mean I could, I could write that, uh, I understand that, you know, I might, you know, so . . . ."), supports the court of appeal's finding that Petitioner did not make an unambiguous request for counsel. <u>See</u> <u>Davis</u>, 512 U.S. at 462 (finding that the statement, "[m]aybe I should talk to a lawyer," was ambiguous, and hence was not a request for counsel). Moreover, Petitioner acted in a manner inconsistent with that of an individual who wished to consult with an attorney, indicating to the interviewing officers that he was indeed willing to talk to them. And, the fact that Petitioner actually did unambiguously invoke his right to counsel later in the interview confirms that he understood his rights and was initially willing to relinquish them. In sum, the California Court of Appeal's determination that officers obtained an unambiguous statement from Petitioner that he was willing to talk to them was not contrary to, or an unreasonable application of, clearly established Federal law. <u>See</u> 28 U.S.C. § 2254(d)(1). Nor was the court of appeal's determination of the facts unreasonable in light of the entire record. <u>See</u> <u>id.</u> § 2254(d)(2).

United States District Court
For the Northern District of California

16

**United States District Court**
For the Northern District of California

Petitioner cites <u>Rodriguez</u> as controlling precedent.  But, as Respondent correctly avers, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1).  It, therefore, cannot form the basis for habeas relief under AEDPA."  <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2155 (2012).  Even if the Court were to look to <u>Rodriguez</u> for guidance, the case is distinguishable.  In <u>Rodriguez</u>, the suspect's response "I'm good for tonight" after police read him his <u>Miranda</u> rights and asked if he wished to speak did not establish an implied waiver.  518 F.3d at 1077.  Rather, in the context of a <u>Miranda</u> waiver, the suspect's response could have meant that he was willing to talk or that he was invoking his right to silence.  <u>Id.</u> at 1076-77.  In such circumstances, the Ninth Circuit held, that "the 'clear statement' rule of Davis addresses only the scope of invocations of <u>Miranda</u> rights in a post-waiver context."  <u>Id.</u> at 1078-79.  <u>Davis</u> did not, however, "address what the police must obtain, in the initial waiver context, to begin questioning."  <u>Id.</u> at 1079 (emphasis omitted).  In light of the fact that the officers here obtained an unambiguous statement from Petitioner that he was willing to talk to them in the initial waiver context, <u>Rodriguez</u> is distinguishable.

Finally, Petitioner is not entitled to federal habeas relief because it cannot be said that the admission of his statements to the officer, even if in violation of <u>Miranda</u>, "had a substantial and injurious effect or influence in determining the jury's verdict."  <u>Jackson v. Giurbino</u>, 364 F.3d 1002, 1010 (9th Cir. 2004) (quoting <u>Calderon v. Coleman</u>, 525 U.S. 141, 147 (1998)).  At trial, the prosecution presented evidence that the fires were connected and that Petitioner was observed at several of the fires.  Additionally, evidence obtained from a lawful search on August 12, 2007 showed that Petitioner was in possession of items that caused the fires.  That search also produced evidence that Petitioner was growing, selling, and chemically extracting marijuana.  Petitioner himself testified at trial that he had no alibis for the fires, and he admitted his involvement in marijuana sales and production.  His own character witnesses confirmed that he grew marijuana.

In sharp contrast, Petitioner's statements to the officers during the August 12, 2007

17

United States District Court
For the Northern District of California

1    interview amounted to nothing more than an admission that he had knowledge of the fires

2    and familiarity with the Jacks Peak area generally.  Petitioner did not admit to having been

3    involved in the fires.  In view of the substantial evidence in support of Petitioner's

4    conviction, the admission of his statement to the officers, even if constitutional error, did not

5    prejudice him so as to entitle him to federal habeas relief.  See Brecht v. Abrahamson, 507

6    U.S. 619, 637 (1993).

7         **B.    Petitioner's Second Claim: Improper Exclusion of Evidence**

8         Petitioner claims that the trial court's exclusion of evidence of an alleged attempted

9    arson on Jacks Peak on August 18, 2007 violated his due process right to a fair trial and to

10   present a defense.  The claim is without merit.

11        **1.    Background**

12        On August 18, 2007, six days after defendant was arrested, while he was in
     custody, Jackson Sheriden (age 19) and Robert Savale (age 20) made an
13   incendiary device out of a deconstructed roman candle firework and electrical
     tape, drove to Jacks Peak, ignited the device, tossed it out the window of
14   Sheriden's car onto the stone driveway at 505 Valenzuela Road, and drove
     away. The device burned out and did not start a fire. A few minutes later, the
15   two young men drove past the driveway to check on the results of their efforts.

16        The resident at 505 Valenzuela found the device and reported the incident.
     Images from the Cal Fire surveillance cameras and the camera on the resident's
17   gate allowed investigators to identify Sheriden's car and Sheriden.
     Investigators contacted both Sheriden and Savale. Sheriden initially denied
18   being in the area. Both men said they threw the device out of the car window
     "to see what would happen." They denied any intent to start a fire and said they
19   threw the device on the driveway near a stone wall to avoid starting a fire. Both
     men pleaded guilty to throwing a lighted substance on a roadway (Health &
20   Saf.Code, § 13003, subd. (a)).

21        At trial, defendant made a motion in limine to admit evidence regarding the
     incident involving Sheriden and Savale as evidence of third party culpability.
22   Defendant argued that the prosecution's case was a "complex web of
     circumstances" and that this evidence of an attempted arson would diffuse the
23   prosecution's assertion that the Jacks Peak fires stopped after defendant was
     arrested. Defendant argued that the evidence was relevant because: (1) the
24   August 18, 2007 incident occurred very close to the locations of three charged
     fires that occurred on Valenzuela Road (counts 1, 5, and 7); (2) it involved an
25   unusual incendiary device, similar to that used in count 10; and (3) Savale
     worked close to the location of the uncharged fire in Pebble Beach.
26   The prosecutor argued that the evidence was not relevant because Sheriden and
     Savale's device did not start a fire; they threw it onto a paved area near a stone
27   wall and if they wanted to set a fire, there was lots of vegetation nearby.

28

                                              18

1

Moreover, there was no evidence that linked Sheriden and Savale to the charged or the uncharged fires.

2

3

The trial court stated that "a couple of the circumstances are enough to raise an eyebrow," including the location and the timing of the behavior. But, the court observed that there was no fire in the August 18, 2007 incident and that there was no evidence linking Sheriden and Savale to any of the fires at issue. The court reasoned that if Sheriden and Savale were responsible for the Jacks Peak fires, they would have shown up on the video surveillance at various times, just like defendant did. The court stated that if they wanted to set a fire, the driveway next to a stone wall would have been the last place they would have tossed the device. The court found that there were insufficient links between Sheriden and Savale's behavior and the charged fires to put this evidence before the jury and denied the motion.

4

5

6

7

8

9

Scott, 2011 WL 766946, at *25-26.

10

On appeal, Petitioner argued that the trial court abused is discretion in excluding the

11

proffered third party culpability evidence and that such exclusion violated his due process

12

rights to a fair trial and to present a defense.  The California Court of Appeal rejected both

13

contentions.  The court reviewed the standard by which the trial court assessed the

14

admissibility of proposed third-party culpability evidence, finding that such evidence

15

"should be treated 'like any other evidence: if relevant it is admissible unless its probative

16

value is substantially outweighed by the risk of undue delay, prejudice, or confusion.'"  Id.,

17

at *26 (quoting People v. Hall, 41 Cal. 3d 826, 834 (1986) (internal citations omitted)).  But,

18

the court noted that the California Supreme Court has also held that "evidence of mere

19

motive or opportunity to commit the crime in another person, without more, will not suffice

20

to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial

21

evidence linking the third person to the actual perpetration of the crime."  Id. (quoting Hall,

22

41 Cal. 3d at 833) (emphasis added).

23

The court of appeal found that Petitioner did not demonstrate that the proffered

24

evidence met the threshold requirements of Hall.  Id., at *28.  None of the evidence put

25

Sheriden or Savale on Jacks Peak at the time of the fires.  Id.  Nor did the materials they used

26

to construct the incendiary device or the manner in which they threw the device link them to

27

any of the fires.  Id.  Sheriden and Savale did not actually start a fire either.  Id.  The court

28

United States District Court
For the Northern District of California

1    concluded that the trial court did not abuse its discretion when it found that the evidence was

2    not relevant and thus inadmissible, and for essentially the same reasons, rejected Petitioner's

3    due process claim. <u>Id.</u>, at *28-29.

4               **2.**       **Clearly Established Federal Law**

5         A state court's evidentiary ruling is not subject to federal habeas review unless

6    the ruling violates federal law, either by infringing upon a specific federal constitutional or

7    statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed

8    by due process.  <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>Jammal v. Van de Kamp</u>, 926

9    F.2d 918, 919-20 (9th Cir. 1991).  Failure to comply with state rules of evidence is neither a

10   necessary nor a sufficient basis for granting federal habeas relief on due process grounds.

11   <u>See</u> <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999); <u>Jammal</u>, 926 F.2d at 919.  While

12   adherence to state evidentiary rules suggests that the trial was conducted in a procedurally

13   fair manner, it is certainly possible to have a fair trial even when state standards are violated.

14   <u>Perry v. Rushen</u>, 713 F.2d 1447, 1453 (9th Cir. 1983).

15        "State and federal rulemakers have broad latitude under the Constitution to establish

16   rules excluding evidence from criminal trials."  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324

17   (2006) (internal quotations and citations omitted); <u>see</u> <u>also</u> <u>Montana v. Egelhoff</u>, 518 U.S.

18   37, 42 (1996) (holding that due process does not guarantee a defendant the right to present

19   all relevant evidence).  This latitude is limited, however, by a defendant's constitutional

20   rights to due process and to present a defense, rights originating in the Sixth and Fourteenth

21   Amendments.  <u>See</u> <u>Holmes</u>, 547 U.S. at 324.  "[A]t times a state's rules of evidence cannot

22   be mechanistically applied and must yield in favor of due process and the right to a fair

23   trial."  <u>Lunbery v. Hornbeak</u>, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's

24   application of its evidentiary rules to exclude hearsay testimony that bore persuasive

25   assurances of trustworthiness and was critical to the defense violated right to present

26   evidence).  <u>But see</u> <u>Rhoades v. Henry (Baldwin)</u>, 638 F.3d 1027, 1034-36 (9th Cir. 2011)

27   (finding no due process violation in state court's decision to exclude as unreliable the

28

20

United States District Court
For the Northern District of California

1   hearsay evidence that third party confessed where confession was made while intoxicated,

2   was later recanted, and was unsupported by physical evidence).  Importantly, the exclusion

3   of evidence that another person may have committed the crime violates due process and the

4   Sixth Amendment.  See Chambers v. Mississippi, 410 U.S. 284 302-03 (1972); see also

5   Lunbery, 605 F.3d at 760 (exclusion of critical hearsay testimony pointing to another killer

6   was an unreasonable application of Chambers).

              **3.   Analysis**

7              The California Court of Appeal's determination that the proffered third party

8

9   evidence was not relevant to the crimes at issue was not contrary to, or an unreasonable

10  application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  Rather, the court of

11  appeal reasonably concluded that there was no direct or circumstantial evidence linking

12  Sheriden and Savale to the actual perpetration of the crimes.  The evidence did not establish

13  that either men were on Jack's Peak at the time of any of the fires.  Additionally, the

14  incendiary device they constructed was markedly different from those used to start the arson

15  fires at issue.  Finally, Sheriden and Savale threw their device onto a paved driveway, not

16  into dry brush, and did not actually start a fire.  Petitioner's suggestion that Sheridan and

17  Savale were responsible for the fires is speculative at best.  It tends only to show that

18  Sheridan and Savale had the opportunity to commit an arson.  Under the circumstances, the

19  decision to exclude the evidence was well within the permissible scope of discretion and did

20  not render Petitioner's trial fundamentally unfair.  See Spivey v. Rocha, 194 F.3d 971, 978

21  (9th Cir. 1999) (finding that the trial court's exclusion of purely speculative evidence as to a

22  third party's possible motive for committing the crime did not render the trial fundamentally

23  unfair).  At a minimum, it cannot be said that the California Court of Appeal's rejection of

24  Petitioner's federal claim was objectively unreasonable.  See Williams, 529 U.S. at 409.

25             Even if there was an evidentiary error of constitutional dimension, habeas relief

26  would not be warranted because the error would be harmless under Brecht v. Abrahamson,

27  507 U.S. 619 (1993).  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).  As the

28

California Court of Appeal noted, "[Petitioner's] contention that the Sheriden and Savale incident was relevant because of its similarities to the fires in counts 1, 5, 7, and 10 is undercut by the fact that defendant was acquitted of those counts.  Thus, even if there were some similarities between the incident and those counts, the failure to admit the evidence was clearly harmless."  <u>Scott</u>, 2011 WL 766946, at *28.

## V.   CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: April 11, 2013

_____
CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.12\Scott, L.12-0717.denial.final.wpd